<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WHAT A SMOKE, LLC, <br><br> Plaintiff, <br><br> v. <br><br> DURACELL U.S. OPERATIONS, INC., <br><br> Defendant. | No. 19cv16657 (EP) (JSA) <br><br> **OPINION** |

**PADIN, District Judge.**

In this case, Plaintiff What a Smoke, LLC ("WAS") alleges Defendant Duracell U.S. Operations, Inc. ("Duracell") infringed on WAS' "OPTIMUM" trademark. WAS moves for summary judgment on Duracell's affirmative defenses. D.E. 193-2. Duracell moves for summary judgment on WAS' operative complaint, or, alternatively, partial summary judgment on damages. D.E. 200. The Court decides the motions on the papers. *See* Fed. R. Civ. P. 78(b); L.Civ.R. 78(b). The Court has reviewed the parties' submissions, and, for the reasons below, the Court will **GRANT** Duracell's motion and **DISMISS** WAS' complaint **with prejudice**. Consequently, the Court will **DENY** WAS' motion as **MOOT**.

I.    **BACKGROUND**[1]

    A.  **Factual Background**[2]

    *1.  WAS*

    WAS is a New Jersey company located in Flanders, New Jersey, that is owned and managed by Mark Anton ("Mr. Anton"), WAS' sole employee.  Duracell SOF ¶¶ 1, 6; WAS Reply to SOF ¶¶ 1, 6.  Mr. Anton's LinkedIn page describes WAS as "a vapor [and] electronics cigarette company."  Duracell SOF ¶ 2; WAS Reply to SOF ¶ 2.

    WAS previously sold Electronic Nicotine Delivery Systems ("ENDS devices"), which are used for vaping and subject to U.S. Department of Health and Human Services Food and Drug Administration ("FDA") regulations.  Duracell SOF ¶¶ 7, 48; WAS Reply to SOF ¶¶ 7, 48.  WAS sought FDA approval for multiple "OPTIMUM" (the at-issue mark)[3] ENDS devices ("WAS Optimum Vaporizers"),[4] which the FDA ultimately denied and prohibited the sale of WAS Optimum Vaporizers in the United States.[5]  Duracell SOF ¶¶ 9, 13; WAS Reply to SOF ¶¶ 9, 13.

    The WAS Optimum Vaporizers contain multiple internal electrical components, including an interchangeable lithium ion ("Li-ion") battery cell that is built into the device.  Duracell SOF ¶¶ 16-18, 33; WAS Reply to SOF ¶¶ 16-18, 33.  The battery is not visible or

---

[1] This section derives mainly from the parties' statements of facts as to Duracell's motion.  *See* D.E. 200-1 ("Duracell SOF"); D.E. 202-1 at 1-40 ("WAS Reply to SOF"); D.E. 202-1 at 41-46 ("WAS Counter-SOF"); D.E. 204-1 ("Duracell Reply to Counter-SOF").
[2] The facts are undisputed unless otherwise noted.
[3] *See infra* Section I(A)(3) (discussing the "OPTIMUM" mark).  For clarity, the Court only capitalizes "OPTIMUM" when directly referencing the registered mark.
[4] WAS disputes referring to its at-issue products collectively as "vaporizers."  *See* WAS Reply to SOF ¶ 9.  For purposes of this Opinion, the Court characterizes the parties' products by their primary purpose.
[5] The parties dispute whether the letter applies to cannabis products.  *See* Duracell SOF ¶ 15; WAS Reply to SOF ¶ 15.  This dispute is immaterial to the Court's analysis.

accessible by the consumer. *See* Duracell SOF ¶ 17; WAS Reply to SOF ¶ 17. Thus, if a consumer needs the battery replaced, they must either get it serviced or purchase a new WAS Optimum Vaporizer. *See* Duracell SOF ¶ 17; WAS Reply to SOF ¶ 17. WAS has never made or sold these Li-ion battery cells as a standalone product. Duracell SOF ¶ 22; WAS Reply to SOF ¶ 22. The WAS Optimum Vaporizers cannot operate with AA or AAA alkaline batteries. Duracell SOF ¶ 24; WAS Reply to SOF ¶ 24.

WAS advertised the WAS Optimum Vaporizers at trade shows[6] and on its website, but did not use social media, print, radio, TV, or other online advertising. Duracell SOF ¶¶ 35-38, 43; WAS Reply to SOF ¶¶ 35-38; 43. The image below depicts some WAS Optimum Vaporizers and other "Optimum" products.



Duracell SOF ¶ 29; WAS Reply to SOF ¶ 29.

### 2. Duracell

Duracell manufactures and sells AA and AAA alkaline batteries under its Duracell trademark and copper and black trade dress; consumers use Duracell batteries to power a variety of products, including common household devices. Duracell SOF ¶¶ 90-91; WAS Reply to SOF ¶¶ 90-91. WAS and Duracell are not competitors. Duracell SOF ¶ 23 (citing D.E. 200-16 ("Schafer Dep."),[7] 51:6-15); WAS Reply to SOF ¶ 23.[8]

---

[6] WAS has not exhibited at any trade show since 2016. Duracell SOF ¶ 37; WAS Reply to SOF ¶ 37.
[7] Deposition of WAS' damages expert.

In July 2019, Duracell launched Duracell Optimum: a premium sub-brand of AA and AAA alkaline batteries ("Duracell Optimum Batteries"). *See* Duracell SOF ¶¶ 92-93; WAS Reply to SOF ¶¶ 92-93. Duracell Optimum Batteries are primarily distributed at large mass market retailers (*e.g.*, Walmart, CVS, Costco) in a separate Duracell battery display or alongside other major battery brands. Duracell SOF ¶¶ 96-97; WAS Reply to SOF ¶¶ 96-97. Duracell Optimum Batteries currently sell at retail stores like Target for approximately $1.50 to 2.00 per battery and in the past sold for approximately .60 to .90 cents per battery. Duracell SOF ¶ 93; WAS Reply to SOF ¶ 93.

Duracell advertises the Duracell Optimum Batteries "in TV commercials, its website, eCommerce, digital videos, in store radio, and social media"; these advertisements refer to the product "visually and orally as 'Duracell Optimum.'" Duracell SOF ¶ 101 (citing D.E. 200-35 36:10-13, 40:19-41:12, 44:2-25, 49:8-23); WAS Reply to SOF ¶ 101.[9] The target audience for Duracell Optimum Batteries is "adults aged 35 to 54 with children[] who own many battery-powered devices . . . ." Duracell SOF ¶ 100; WAS Reply to SOF ¶ 100.

---

[8] WAS disputes this fact, stating their expert testified "I don't believe [WAS and Duracell] are [competitors,]" not that WAS and Duracell are affirmatively competitors. WAS ¶ 23 (alterations in original) (quoting Schafer Dep. 51:14-15). But WAS cites no evidence to contradict its expert's statement or to support the parties are competitors. This fact is thus deemed admitted. *See* L.Civ.R. 56.1 (emphasis added) ("The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement [to the movant's] material facts, addressing each paragraph of the movant's statement . . . ." If the opponent denies the movant's fact, the opponent must "**cit[e] to the affidavits and other documents submitted in connection with the motion" or otherwise concede the fact**.).

[9] WAS disputes this fact, stating "[m]ultiple instances can be found where [Duracell] batteries are referred to solely as Optimum or Optimum batteries[,] including [Duracell's] own website www.duracell.com." WAS Reply to SOF ¶ 101. WAS does not provide photo evidence or any further examples, and when reviewing the website, there are no instances where the Duracell Optimum Batteries are not connected with the "Duracell" mark. This fact is thus deemed admitted. *See* L.Civ.R. 56.1.

Duracell does not market its products on platforms "associated with adult entertainment, drugs, smoking, alcohol, or politics[,]" including vaping stores, nor is Duracell aware of any Duracell Optimum Batteries sold in such stores.  Duracell SOF ¶¶ 103, 105; WAS Reply to SOF ¶¶ 103, 105.   Similarly, other major household battery brands (Energizer, Rayovac) do not make or sell vaping products.  Duracell SOF ¶ 104; WAS Reply to SOF ¶ 104.

The photo below depicts the Duracell Optimum Batteries packaging when it was first launched and as it currently appears, respectively.



*(first launched)*



*(current appearance)*

Duracell SOF ¶¶ 94-95; WAS Reply to SOF ¶¶ 94-95.

### 3. *The OPTIMUM Mark*

WAS owns the trademark registrations for the word mark OPTIMUM ("OPTIMUM Mark") and its composite mark, which were registered on August 9, 2016, with the United States Patent and Trademark Office ("USPTO").   WAS SOF ¶¶ 5-7; Duracell Reply to SOF ¶¶ 5-7. Both trademark registrations identified the goods as "[p]ower sources, namely, batteries, battery chargers and AC power adapters for electronic cigarettes" and "[a]tomizers and refill cartridges for electronic cigarettes . . . ."  WAS SOF ¶¶ 10, 12; Duracell Reply to SOF ¶¶ 10, 12.

Before Duracell launched Duracell Optimum Batteries, Duracell's marketing group engaged in its standard process to determine what to name the sub-brand.  Duracell SOF ¶ 108; WAS Reply to SOF ¶ 108.   In September 2018, Duracell's marketing group selected the "Optimum" sub-brand name.  Duracell SOF ¶ 108; WAS Reply to SOF ¶ 108.  Duracell was unaware of WAS or its OPTIMUM Mark registrations until after Duracell's legal group conducted the company's standard trademark clearance process.  Duracell SOF ¶¶ 108-110; WAS Reply to SOF ¶¶ 108-110. [10]

After learning of the OPTIMUM Mark, Duracell filed trademark applications for the word marks "OPTIMUM" and "DURACELL OPTIMUM," which identified the products as "batteries."  WAS SOF ¶¶ 8-14; Duracell Reply to SOF ¶¶ 8-14.  The USPTO's examining attorney ("USPTO Attorney") preliminarily rejected both applications on February 22, 2019,

---

[10] WAS asks for an adverse inference as to testimony about Duracell's trademark search and clearance because Duracell representatives asserted the attorney-client privilege during their depositions. *See* WAS Reply to SOF ¶ 108.  However, WAS cites no evidence contradicting that Duracell learned of the OPTIMUM Mark during the trademark clearance process, nor do courts impose an adverse inference for assertion of the attorney-client privilege, including in trademark infringement cases.  Thus, Duracell's statement it did not learn of the OPTIMUM mark until the trademark clearance process is admitted, and the Court will not adopt an adverse inference.  *See* L.Civ.R. 56.1; *infra* Section III(E) (elaborating as to why the Court rejects an adverse inference).

based on a likelihood of confusion with the WAS OPTIMUM Mark.  WAS SOF ¶¶ 15-16 (citing

D.E.s 5-13 & 5-14); Duracell Reply to SOF ¶¶ 15-16.

Thereafter, in March 2019, Duracell's outside counsel communicated with WAS' counsel

that Duracell planned to launch Duracell Optimum Batteries.  Duracell SOF ¶ 111; WAS Reply

to SOF ¶ 111.  Duracell's counsel stated that Duracell would not seek cancellation of WAS'

registrations, which Duracell believed were overbroad, if WAS informed the USPTO that WAS

consented to Duracell's trademark applications.  Duracell SOF ¶ 111; WAS Reply to SOF ¶ 111.

On July 12, 2019, WAS' counsel offered to agree to this proposal if Duracell paid WAS

$150,000.  Duracell SOF ¶ 113; WAS Reply to SOF ¶ 113.  WAS later revoked the offer and

filed the instant suit on August 13, 2019.  Duracell SOF ¶ 114; WAS Reply to SOF ¶ 114; *see

also* D.E. 1.

On September 19, 2019, the USPTO Attorney "maintained and continued" the refusal of

Duracell's applications due to WAS' OPTIMUM Mark.  WAS SOF ¶¶ 19-20 (citing D.E.s 5-58

& 5-60).

### 4. No confusion between the parties' products

"WAS is not aware of any instance where a consumer purchased a WAS product

believing it to be made, approved or sponsored by, or affiliated with Duracell" or an instance

"where a  consumer purchased [] Duracell Optimum [B]atter[ies] believing [the product was]

made, approved or sponsored by, or affiliated with WAS."  Duracell SOF ¶¶ 53, 55 (first citing

200-43 ("Anton Dep."), 87:2-5; then citing Schafer Dep. 60:22-61:9); WAS Reply to SOF ¶¶ 53,

55.  Additionally, representatives from various retail stores that sell vaping products and were

WAS customers in 2016 testified that they were not aware of any instances of confusion between

the parties' Optimum products.  *See* Duracell SOF ¶¶ 58, 66-67, 69, 72 (citing D.E.s 200-6 to

200-10 (citations omitted)). One retail store noted that its salespeople also knew the source of WAS Optimum Vaporizers because they received training on the products to assist new buyers. *See* Duracell SOF ¶ 60 (citing D.E. 200-6 62:15-69:1); WAS Reply to SOF ¶ 60.

Duracell's survey expert, Dr. Sara Butler, "designed a reverse confusion survey to determine whether consumers of vaping devices believed that WAS' Optimum [Vaporizers] are made or put out by, associated or affiliated with, or received permission from Duracell to use the [OPTIMUM Mark]." Duracell SOF ¶ 115 (citing D.E. 200-33 ("Butler Report")); WAS Reply to SOF ¶ 115. Dr. Butler ran two reverse confusion surveys, first in October 2019 and then in October 2021. Duracell SOF ¶ 115; WAS Reply to SOF ¶ 115. "Survey respondents were shown [WAS Optimum Vaporizers] and asked a series of questions to determine whether there was any likelihood of confusion with [Duracell Optimum Batteries]." Duracell SOF ¶ 115 (citing Butler Report ¶ 48); WAS Reply to SOF ¶ 115. "Only 1 out of 605 respondents mentioned Duracell in Dr. Butler's reverse confusion surveys." Duracell SOF ¶ 115 (citing Butler Report ¶ 77); WAS Reply to SOF ¶ 115.[11] WAS did not conduct any consumer confusion surveys, even though WAS' survey expert was not aware of any financial or time limitations preventing her from doing so. Duracell SOF ¶ 76-77; WAS Reply to SOF ¶¶ 76-77.

### 5. *Third-party use of OPTIMUM*

Other parties use "OPTIMUM or derivations of OPTIMUM as trade names, trademarks or service marks in the United States in the fields of batteries, vaping products, electronics or technology." Duracell SOF ¶ 117; WAS Reply to SOF  117. Duracell's trademark search report, ordered before Duracell adopted the Duracell Optimum trademark, revealed registrations

---

[11] WAS argues the survey methodology was flawed but does not dispute that Duracell accurately reports Dr. Butler's findings, nor did WAS conduct its own survey. *See* WAS Reply to SOF ¶ 115.

"preced[ing] WAS' registrations and contain[ing] the word OPTIMUM or derivations thereof in connection with batteries . . . ."  Duracell SOF ¶ 118 (citing examples); WAS Reply to SOF ¶ 118.

Additionally, "[a] business entity name search of the State of New Jersey's online database reveals 396 business names containing the word 'optimum.'"  Duracell SOF ¶ 119; WAS Reply to SOF ¶ 119.

### B.  Procedural Background

WAS filed this case on August 13, 2019, D.E. 1, and moved for a preliminary injunction on September 20, 2019, D.E. 5.  After approximately eight months of discovery and briefing, the Court[12] held a hearing on the motion.  D.E. 109.  The Court denied the motion for lack of irreparable harm.  *Id.*

After the Court[13] granted Duracell's partial motion to dismiss, D.E.s 110, 111, WAS filed the operative third-amended complaint, D.E. 114 ("TAC" or "Third Amended Complaint").  The TAC asserts a trademark infringement claim (Count One) against Duracell, which alleges that "Duracell's use of a confusingly similar and identical term Optimum and Duracell Optimum has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression" that WAS Optimum Vaporizers are affiliated with Duracell.  TAC ¶ 29. The TAC also asserts federal and state unfair competition claims (Counts Two and Three) that are contingent on the same allegations.  *Id.* ¶¶ 33-40.  Duracell answered the TAC and asserted counterclaims against WAS.[14]  D.E. 115.

---

[12] John M. Vazquez, United States District Judge.

[13] Judge Vazquez.

[14] Though the merits of these counterclaims are not at issue, Duracell requests that, if its motion is successful, the Court dismiss its counterclaims without prejudice.  *See* D.E. 200-2.

WAS moves for summary judgment as to Duracell's affirmative defenses.[15] D.E. 193. Duracell opposes. D.E. 196. WAS replies. D.E. 198. Duracell also moves for summary judgment as to the TAC, or, alternatively, for partial summary judgment on damages.[16] D.E. 200 ("Mot."). WAS opposes. D.E. 202 ("Opp'n"). Duracell replies. D.E. 204 ("Reply").

## II.   LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over nonmaterial facts will not preclude a court from granting summary judgment. *See id.*

The moving party has the initial burden of showing the basis for its motion and demonstrating that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must support its motion by citing to specific materials in the record. Fed. R. Civ. P. 56(c)(1)(A).

If a moving party adequately supports its motion, then the burden shifts to the nonmoving party to "go beyond the pleadings" and designate specific facts on the record that demonstrate a genuine dispute for trial exists. *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). Specifically, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to

---

[15] Because the Court will dismiss WAS' motion as moot, the Court only briefly mentions it here and in the holding.

[16] Likewise, the Court will not address Duracell's alternative motion.

provide such evidence, or where the "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50). However, "[i]f reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250-51.

In reviewing a motion for summary judgment, a court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marina v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). But if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 322.

## III.   ANALYSIS

### A.  Infringement Standard

To prove trademark infringement, a plaintiff must demonstrate that "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Here, the parties dispute only whether there is a likelihood of confusion.

"A likelihood of confusion exists when 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Id.* at 211 (quoting *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992)). "The relevant inquiry is not whether consumer

confusion is a possibility, but whether confusion is likely." *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005).

There are two types of confusion claims: forward confusion and reverse confusion. *Id.* at 470. Here, WAS asserts only a reverse confusion claim. *See* TAC ¶ 29. "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Id.* at 471 (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3 466, 474 (3d. Cir 1994)). Thus, WAS (less powerful, senior owner) must prove there is a likelihood that consumers will mistakenly believe the WAS Optimum Vaporizers are manufactured and offered for sale by Duracell (more powerful, junior user). *See A&H Sportswear*, 237 F.3d at 228 (cleaned up) (reverse confusion occurs when "[t]he public comes to assume the senior user's products are really the junior user's [products] or that the former has become somehow connected to the latter").

To determine likelihood of confusion in cases involving noncompeting goods, courts apply ten "*Lapp* factors." *See Interspace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983). These are:

> "(1) [The] degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;[17]
> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

---

[17] This factor can overlap with the fourth *Lapp* factor. *See A&H Sportswear*, 237 F.3d at 233-34.

12

> (8) the extent to which the targets of the parties' sales efforts are the same;[18]
> (9) the relationship of the goods in the minds of consumers because of the similarity of functions; and
> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market."

*Medieval Times U.S.A., Inc. v. Medieval Times Performers United*, 2023 WL 6307464, at *3 (D.N.J. Sept. 28, 2023) (quoting *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001)).  No one factor is determinative, and "the different factors may properly be accorded different weights depending on the particular factual setting."  *A&H Sportswear*, 237 F.3d at 215; *see also Checkpoint*, 269 F.3d at 280 (same).  Because WAS and Duracell are not competitors, the Court will apply the *Lapp* factors.

Duracell argues all ten *Lapp* factors favor finding that WAS cannot establish a likelihood of confusion.  *See* Mot. at 17-33.  WAS disagrees.  *See* Opp'n at 9-31.  The Court agrees with Duracell.

### B.  The Marks Do Not Create the Same Overall Impression

The first *Lapp* factor evaluates the degree of similarity between the owner's mark and the allegedly infringing mark.  *Checkpoint*, 269 F.3d at 280.  To determine whether the allegedly infringing mark is likely to confuse consumers as to the product sources, courts should "move into the mind of the roving consumer . . . and determine whether the labels create the same overall impression when viewed separately."  *Id.* at 281 (cleaned up) (citing cases).  Courts should compare "the appearance, sound[,] and meaning of the marks[]" to determine whether the "average consumer, on encountering one mark in isolated circumstances of [the] marketplace and having only [a] general recollection of the other, would likely confuse or associate the two."

---

[18] This factor can overlap with the seventh *Lapp* factor.  *See Smith v. Ames Dep't Stores, Inc.*, 988 F. Supp. 827, 841 (D.N.J. 1997)

*Id.* (first quoting *Harlem Wizards Ent. Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1096 (D.N.J. 1997); then quoting *Fisons*, 30 F.3d at 477-78).   And even where marks are confusingly similar, this "is not necessarily determinative of likely confusion, particularly where the products do not directly compete[,]" and courts can find other *Lapp* factors outweigh any similarity.  *Id.* at 282 (affirming lower court's overall finding of no likelihood of confusion even where the lower court found the marks were confusingly similar).

Here, the marks do not create the same overall impression.  Although both use the word "Optimum," the similarities end there.   Duracell Optimum Batteries have a consistent appearance: Duracell's copper-and-black battery cell with "Duracell" in bold white letters and "Optimum" in a smaller font in gold or blue letters.



*(first launched)*



*(current appearance)*

Duracell SOF ¶¶ 94-95; WAS Reply to SOF ¶¶ 94-95.

In contrast, WAS Optimum Vaporizers have an inconsistent appearance.  As Duracell highlights, "[t]he only elements consistently featured across the various products are images of smoking-related graphic designs in the 'What A Smoke' house-mark (*e.g.*, the 'o' is designed to look like the end of a burning cigarette) and the 'Optimum' name (*e.g.*, wisps of smoke on the letter 'm')."  Mot. at 18.[19]



Duracell SOF ¶ 29; WAS Reply to SOF ¶ 29.

WAS argues only that the marks are "identical" because both parties use the word "Optimum."  Opp'n at 11.  But to determine the similarity between the marks, courts look beyond the mark's word(s) and evaluate other characteristics, such as the mark's font and colors. For example, in *Medieval Times*, although both parties used the words "Medieval Times" and "employ[ed] red and yellow in some fashion[,]" the marks were dissimilar because "Medieval Times" was "written in different stylized fonts and colors[,]" with one party using yellow or red lettering and the other using black lettering.  2023 WL 6307464, at *4.  WAS does not dispute that beyond the use of the word "Optimum," the parties' product packaging is dissimilar.  *See* Opp'n at 11.

Accordingly, the first *Lapp* factor favors finding no likelihood of confusion.

---

[19] These differences include: (1) the background color; (2) where "OPTIMUM" and "What a Smoke" appear; (3) the images used; and (4) the "OPTIMUM" text color.

### C.  The OPTIMUM Mark is Weak

The second *Lapp* factor evaluates the strength of the owner's mark.  *Checkpoint*, 269 F.3d at 280.  To evaluate the strength of the mark, courts look at "(1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) [the mark's] commercial strength (factual evidence of marketplace recognition)."  *Freedom Card*, 432 F.3d at 472.

#### 1.  The OPTIMUM Mark is conceptually weak

When analyzing a mark's conceptual strength, a strong mark favors the plaintiff/senior user, whereas a weak mark favors the defendant/junior user.  *A&H Sportswear*, 237 F.3d at 231-32; *see also Freedom Card*, 432 F.3d at 472 ("Stronger marks receive greater protection.").  A mark is considered "strong" if it is "so distinctive that[] consumers with a general awareness of [the junior user's product] are likely to assume that the [senior user's product] is [the junior user's] product."  *A&H Sportswear*, 237 F.3d at 237.[20]  Typically, marks are divided into four classifications of "distinctiveness": (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.  *A&H Sportswear*, 237 F.3d at 221.

A "generic" mark is one that "function[s] as the common descriptive name of a product class."[21]  *Id.* at 222 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).  A "descriptive" mark "convey[s] an immediate idea of the ingredients, qualities, or characteristics of the goods."[22]  *Id.* (cleaned up).  A "suggestive" mark "require[s] consumer imagination,

---

[20] For example, "if a customer saw a doll in a toy store bearing a strong familiar trademark like 'Exxon,' he might well assume the oil company had gone into the toy business; if, on the other hand, he saw a doll bearing a familiar but weak laudatory trademark like Merit, he would be unlikely to assume that it is connected with the similarly named gasoline or cigarettes."  *A&H Sportswear*, 237 F.3d at 237 (quoting *H. Lubovsky, Inc. v. Esprit de Corp.*, 627 F. Supp. 483, 487 (S.D.N.Y. 1986)).

[21] "DIET CHOCOLATE FUDGE SODA[.]"  *Id.* at 221.

[22] "SECURITY CENTER[.]"  *Id.* at 221.

16

thought, or perception to determine what the product is."[23]  *Id.* (cleaned up).  And an arbitrary or fanciful mark "use[s] terms that neither describe nor suggest anything about the product; they bear no logical suggestive relation to the actual characteristics of the goods."[24]  *Id.* at 221 (cleaned up).

Generic marks are the classic example of a weak mark.  *Id.*  However, the classification of a mark is not dispositive; rather, it is a "useful guide" to help "determine whether consumers are likely to perceive the mark as a signifier of origin, rather than a mere identification of the type of product."  *Id.*  Thus, descriptive, suggestive, and arbitrary marks can also be weak, "particularly if they are used in connection with a number of different products[,]" such as "common marks like 'Arrow'" or "[s]elf-laudatory marks like 'Sure,' 'Super Duper,' 'Plus,' . . . [and] 'Miracle' . . . ."  *Id.* (cleaned up) (citing cases).

Duracell argues the OPTIMUM Mark is conceptually weak because (1) it is descriptive and self-laudatory and (2) there is widespread third-party use of "Optimum" and similar marks. Mot. at 20.  WAS argues the OPTIMUM Mark is conceptually strong.  *See* Opp'n at 29-30.  The Court agrees with Duracell.

First, WAS argues the mark cannot be "weak" when Duracell's focus groups found it would have the best consumer response.  *Id.* at 29-30.  But WAS misconstrues the test; a mark is "strong" if a consumer is "likely to perceive the mark as a signifier of origin," *A&H Sportswear*, 237 F.3d at 221, not if a consumer is likely to respond positively to the mark and/or purchase the product.  Thus, it is irrelevant that Duracell's focus groups thought the word "Optimum" would sell more batteries.

---

[23] "COPPERTONE[.]"  *Id.* at 221.
[24] "KODAK[.]"  *Id.* at 221.

Second, WAS argues no court in the Third Circuit has identified "optimum" as a self-laudatory mark to determine whether a mark is self-laudatory.  Opp'n at 30.  But courts may compare the at-issue mark with language already determined to be self-laudatory.  *See, e.g.*, *Primepoint, LLC v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 438 (D.N.J. 2008) (finding "'Prime' can be fairly categorized as a self-laudatory prefix[]" when compared to marks like "Super" or "Plus"); *A&H Sportswear*, 237 F.3d at 222 (finding "Miracle" to be a self-laudatory mark when compared to marks like "Sure," "SuperDuper," and "Plus").  Here, the OPTIMUM Mark is self-laudatory because it is used to "convey . . . a particular atmosphere . . . in connection with [its products]," namely that the products are high-quality.  *FM 103.1, Inc. v. Univ. Broadcasting of New York, Inc.*, 929 F. Supp. 187, 195 (D.N.J. 1996) (finding the mark "YOUR HOMETOWN RADIO STATION" was descriptive and self-laudatory because it was used to convey a friendly atmosphere and was "[un]likely to conjure up a purely arbitrary connotation").  Thus, "Optimum" is similar to words like "Prime," "Miracle," "Plus," and "Super," which convey product quality.

Finally, WAS argues that the mark is conceptually strong despite third-party use of "Optimum" because only WAS uses "OPTIMUM" in connection with "battery products." Opp'n at 30.  But WAS flips "widespread use" on its head.  It is the use of "optimum" in connection with non-battery products that makes the term widespread, like "Super" or "Plus." Thus, because "Optimum" is used in a variety of markets, consumers can likely distinguish between the parties' products.  *See A&H Sportswear*, 237 F.3d at 223-24.  And as Duracell notes, and WAS does not dispute, many companies use "Optimum" in a brand name.  *See* Reply at 11; Opp'n at 30.[25]

---

[25] *See also* Duracell SOF ¶¶ 117-120 (providing numerous examples).

Accordingly, the Court finds that the OPTIMUM Mark is conceptually weak.

*2. The OPTIMUM Mark is commercially weak*

"[I]n a reverse confusion claim, a court should analyze the 'commercial strength' factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark." *A&H Sportswear*, 237 F.3d at 231. "[C]ourts must look at the strength of the mark in the industry in which infringement is alleged" (the senior user's market). *Checkpoint*, 269 at 284. "The greater the commercial disparity between the [junior and senior users], the more likely it is that a consumer's first experience with a mark will be with one particular manufacturer. . . . [I]f the greater advertising originates from the junior user, reverse confusion is more likely." *A&H Sportswear*, 237 F.3d at 230. However, even where the junior user is the commercially stronger party, courts can consider the senior user's mark's commercial strength and whether the junior user's mark drove the senior user out of the marketplace. *See Freedom Card*, 432 F.3d at 477.

Here, Duracell is undisputedly the commercially stronger party. *See* Mot. at 22; Opp'n at 31. However, WAS has presented no evidence that Duracell's use of the OPTIMUM Mark drove WAS out of the vaping industry or that WAS' use of the OPTIMUM Mark was commercially strong. *See Freedom Card*, 432 F.3d at 477 (no likelihood of confusion where plaintiff did not provide evidence of its own commercial strength or that defendant drove plaintiff out of the marketplace); *Primepoint*, 545 F. Supp. 2d at 438 (no likelihood of confusion where the plaintiff failed to present any "documentary or testamentary evidence of its well-established strength in the relevant market[,]" such as through consumer surveys).

Accordingly, the second *Lapp* factor favors finding no likelihood of confusion.

### D. Consumers Exercise Care When Purchasing Vaping Devices

The third *Lapp* factor evaluates "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase." 721 F.2d at 463. "When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion." *Checkpoint*, 269 F.3d at 284. Consumers exercise heightened care "[w]here the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers[] . . . ." *Id.* But "[i]f there is evidence that both average consumers and specialized commercial purchasers buy goods," the standard of care exercised by a reasonable purchaser will be equal to the least sophisticated consumer. *Id.* Additionally, "[t]he more important the use of a product, the more care that must be exercised in its selection." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 364 (3d Cir. 2007) (cleaned up) (citing health reasons as an important use of a product).

Duracell argues that the Duracell Optimum Batteries and the WAS Optimum Vaporizers have vastly different price points and different degrees of consumer care when purchasing. Mot. at 24. Specifically, Duracell argues that consumers exercise a greater deal of care when purchasing the WAS Optimum Vaporizers because they were (1) more expensive, requiring a consumer to "invest[] in a collection of [daily] vaping products . . . costing up to $200"; (2) sold in specialty vape shops by trained salespeople; and (3) claimed to be a healthier alternative to cigarettes. Mot. at 24. WAS disagrees with the first two statements. Opp'n at 23. The Court agrees with Duracell.

First, WAS argues the WAS Optimum Vaporizers are not more expensive than Duracell Optimum Batteries because WAS sells singular components to its products that "may cost as

little as $25 or less[,] whereas Duracell's "28 count AA battery and 12 count AAA battery combo pack" may cost upwards of $55.  Opp'n at 23.  However, courts can consider the bundled/investment costs of the at-issue products.  For example, in *Kinbook, LLC v. Microsoft Corp.*, the court considered the joint cost of the at-issue gaming sensor and its corresponding gaming console.  866 F. Supp. 2d 453, 468 (E.D. Pa. 2012).  A WAS Optimum Vaporizers consumer's initial investment of $200 is nearly four times more expensive than Duracell's combo pack, making consumer confusion less likely.  *See id.* (finding no likelihood of confusion where "the only people that would actually purchase [the at-issue gaming sensor] are well aware of the XBOX 360, and would only buy [the gaming sensor] if they already had or planned to purchase an XBOX 360 console"); Duracell SOF ¶ 41 (citing D.E. 200-6 72:15-20, 77:16-22) (Vape store owner testifying that a new user and purchaser of WAS Optimum Vaporizers would "be making an investment.").

Second, WAS argues that its consumers are not more sophisticated than Duracell's because WAS Optimum Vaporizers were not sold exclusively in specialty vape shops, and the vape shop employees received only basic training.  Opp'n at 23.  But even so, these facts, coupled with the health-related nature of the product, support that a consumer would be more discriminating when purchasing a vaping product when compared to other products.  *See McNeil*, 511 F.3d at 365 (consumers exercise "heightened care and attention when buying" products based on "health considerations"); *A&H Sportswear*, 237 F.3d at 225 ("The District Court's conclusion that consumers will be discriminating in their selection of swimwear, whether one-piece or bikinis, rings especially true[]" considering that consumers buying swimsuits "will discern the slimming effect and cleavage enhancement features" of the products.).  And even the least sophisticated consumer can likely distinguish between a vaping device, used for inhaling

and exhaling a substance, and batteries, used to power household items.  *See Kinbook*, 866 F.

Supp. 2d at 468 ("[E]ven the hypothetical precocious 5 year-old dispatched by indulgent parents

(or grandparents) to make her or his own selections of amusement would likely be able to

distinguish between a free software application, and a $150 piece of gaming hardware.").

Accordingly, the third *Lapp* factor favors finding no likelihood of confusion.

### E.  Duracell Did Not Intend to Push WAS Out of the Market

The fifth *Lapp* factor [26] evaluates the intent of the defendant in using the mark.

*Checkpoint*, 269 F.3d at 280.  A plaintiff asserting a reverse confusion claim must demonstrate

the defendant had a "deliberate intent to push the [plaintiff] out of the market . . . ." *Freedom

Card*, 432 F.3d at 479.  The defendant's knowledge of the plaintiff's mark, without more, is not

enough.  *Id.* at 479-80.

Duracell argues there is no evidence that Duracell intended to push WAS out of the

market; rather, the decision to use "Optimum" was based on consumer appeal.  Mot. at 25.

Duracell highlights that it only learned of WAS' trademark registrations after "[t]he marketing

department sent its selection to the legal department as part of standard trademark clearance

process." *Id.* at 26.  WAS argues that Duracell's conduct was intentional, willful, and reckless.

Opp'n at 25-26.  The Court agrees with Duracell.

First, WAS highlights that Duracell eventually learned of the trademark registrations yet

chose to use "Optimum" anyways.  Opp'n at 25-26.  However, mere knowledge of the mark,

without more, cannot prove a deliberate intent to push WAS out of the market.  *See Freedom

Card*, 432 F.3d at 479-80.  WAS also argues that the USPTO's ruling that there was a likelihood

of confusion placed Duracell on notice that its actions were unlawful.  *See* Opp'n at 25 n.20.  But

---

[26] The fourth and sixth *Lapp* factors are considered together.  *See A&H Sportswear*, 237 F.3d at 233-34; *infra* Section III(F) (analyzing these factors together).

USPTO rulings are preliminary rulings made without consideration of the evidence presented to a district court and are not to be given weight in this analysis. *A&H Sportswear*, 237 F.3d at 221. Thus, Duracell was only on notice that the USPTO, without considering any dispositive evidence, preliminarily determined a likelihood of confusion.

WAS also asks the Court to adopt an "adverse inference" against Duracell because during Duracell's senior IP and corporate counsel's deposition, "attorney-client privilege was constantly asserted (well over 50+ times) . . . ." *Id.* at 26 (citing *S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187 (3d Cir. 1994)). However, the case WAS cites discusses an adverse inference when raising Fifth Amendment privilege,[27] not attorney-client privilege. *See generally Graystone Nash*, 25 F.3d 187. And, as noted by Duracell, the Third Circuit has declined to draw an adverse inference from the raising of attorney-client privilege in trademark cases. Reply at 10 (citing *Lucent Info. Mgmt. v. Lucent Techs., Inc.*, 186 F.3d 311, 318 (3d Cir. 1999)).

Accordingly, the Court finds the fifth *Lapp* factor favors finding no likelihood of confusion.

### F. There Has Been No Actual Confusion

The fourth and sixth *Lapp* factors require the Court to evaluate (1) the length of time the defendant has used the mark without evidence of actual confusion and (2) the probative value of any evidence of actual confusion. *See A&H Sportswear*, 237 F.3d at 233-34. The longer a product has been sold without evidence of actual confusion favors finding no likelihood of confusion; relatedly, courts can evaluate the plaintiff's evidence of "confusion" to determine whether the evidence is factually supported and, even if supported, whether the evidence is *de*

---

[27] Also known as "pleading the fifth."

*minimis.  Checkpoint*, 269 F.3d at 291, 297-98; *see also Freedom Card*, 432 F.3d at  478-79 (same).

Duracell argues that these factors favor Duracell because "WAS and Duracell's marks have co-existed for nearly four years" without confusion.  Mot. at 27.  Duracell also highlights its consumer confusion surveys, where only 1 out of 605 respondents mentioned Duracell when questioned about WAS Optimum Vaporizers.  Reply at 12 (citing Duracell SOF ¶ 115 (citing Butler Report ¶ 77)).  WAS does not dispute that it cannot identify instances of actual confusion during the four years the parties' products have co-existed.  Opp'n at 31.  Rather, WAS argues that this evidence is not required at this stage and challenges the credibility of Duracell's surveys.  *Id.*   The Court agrees with Duracell.

First, WAS argues that its lack of evidence is not dispositive because this evidence is difficult to obtain.  *Id.* (citing cases).  It is true that in some cases, plaintiffs are not required to produce this evidence; however, that is limited to circumstances where "the time period that the two products have been in competition is short or where the particular circumstances [do not] indicate such evidence should have been available[] . . . ."  *Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 205 (3d Cir. 1995)).  Here, the parties' products have coexisted for approximately four years without evidence of confusion, which favors Duracell.  *See Checkpoint*, 269 F.3d at 298-99 n.25 (no likelihood of confusion where the parties coexisted for approximately five years without significant evidence of confusion).

Additionally, WAS does not explain why this evidence is unavailable, especially considering that Duracell conducted two consumer confusion surveys during the same period.  Even if the Court did not consider Duracell's surveys, as WAS urges, it is still WAS' burden to provide "significant evidence of confusion[,]" yet WAS provides no evidence whatsoever.  *See*

*Checkpoint*, 269 F.3d at 298-99 (a "handful of e-mails and other anecdotal evidence of mistaken consumer inquiries" was *de minimis*); *Freedom Card*, 432 F.3d at 478 (cleaned up) (one instance of uncorroborated confusion, even if true, was *de minimis* and "insufficient to prevent dismissal on summary judgment").

Accordingly, the fourth and sixth *Lapp* factors favor finding no likelihood of confusion.

### G.  No Overlapping Trade Channels or Same Target Consumers

The seventh *Lapp* factor is "the extent to which the parties' goods are marketed through the same channels of trade[.]"  *Checkpoint*, 269 F.3d at 288.  "Courts have recognized that 'the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion.'"  *Id.* at 288-89 (quoting *Acxiom Corp. v. Axiom, Inc.*, 27 F. Supp. 2d 478, 502 (D. Del. 1998)).  This is a fact-intensive inquiry.  *Id.* at 289.  Relatedly, the eighth *Lapp* factor considers whether the parties market their products to the same consumer base.  *See Smith*, 988 F. Supp. at 841 (considering channels of trade and consumer bases together).

Duracell argues the parties' trade channels do not overlap because "Duracell Optimum [B]atteries are marketed and sold primarily through mass retail channels and television and always alongside the DURACELL house mark, whereas WAS Optimum [Vaporizers] were sold . . . in local specialty vape shops with virtually no marketing since 2016."  Mot. at 28.  WAS argues that the parties' trade channels overlapped.  Opp'n at 18-22.  The Court agrees with Duracell.

First, WAS again argues that its products were not exclusively sold in specialty vape shops and claims it "was working towards having its products carried in national and regional retailers such as Kroger, CVS, and Speedway."  Opp'n at 19-20.  But "working towards" selling a product in larger retail channels is not the same as doing so.  And even if not all WAS

Optimum Vaporizers were sold in specialty vape shops, WAS does not dispute that none of Duracell's products, including Duracell Optimum Batteries, were sold in these shops. *See id.*

Additionally, WAS argues that Duracell "overlapping with [WAS] is inevitable" because Duracell "markets at all levels throughout the world" and "[c]onsumers of [WAS' products] are ordinary consumers and would also be consumers of Duracell batteries." *Id.* at 20. But the test is not whether consumers who buy one party's product would, at some point, also buy the other party's product.[28] Rather, the test is whether the parties utilize the same marketing and trade channels to target its consumer base. *See Checkpoint*, 269 F.3d at 289 (no overlapping trade channels where the parties' products were not "offered at the same time in any magazine, trade show, or distribution network"); *Smith*, 988 F. Supp. at 841 (no overlapping trade channels between two clothing companies where one exhibited goods at trade shows and promoted products to celebrities and the other used "its own circulars and in-store promotions"); *Guantanamera Cigars Co. v. SMCI Holding, Inc.*, 2023 U.S. Dist. LEXIS 96562, at *7-8 (S.D. Fla. June 2, 2023) (no overlapping trade channels where one cigar company presented itself as "high-end, premium Cuban-style cigars" and targeted "knowledgeable cigar aficionados[,]" whereas the other company targeted a "budget-conscious consumer base").

WAS' and Duracell's different target consumers further highlight the lack of overlap between the parties' trade channels. As Duracell argues, Duracell does not target vape stores, and WAS does not target big box retailers or those looking to power household devices. Mot. at 29. WAS argues that because Duracell's products are "widely available to virtually anyone[,]"

---

[28] Additionally, WAS does not dispute that WAS Optimum Vaporizers cannot use AA or AAA batteries; thus, a consumer who buys a WAS Optimum Vaporizer would not purchase Duracell Optimum Batteries for use in the former. *See* Duracell SOF ¶ 24; WAS Reply to SOF ¶ 24.

their target audiences will inevitably overlap, especially when considering that some vaping devices use AA batteries. Opp'n at 27.

But again, the inquiry is not, broadly, whether any of the parties' consumers will overlap; the question is whether the parties target the same consumers. First, WAS' Optimum Vaporizers cannot use Duracell's Optimum Batteries, so it is irrelevant whether non-WAS Vaporizers consumers would buy Duracell Optimum Batteries to power their non-WAS product. Further, WAS targets adults in search of a vaping device, typically in a specialty vape store, whereas Duracell targets average consumers who seek to power a variety of items, typically in large retailers like Wal-Mart and Target. And even if a consumer often purchases both products, courts find the consumer bases do not overlap where the products serve different functions. *See Checkpoint*, 269 F.3d at 269 (security products were not targeted to the same consumers "[e]ven though many companies often purchase both types of products[]" because the products were not used for the same type of security). It is undisputed that the WAS Optimum Vaporizers' primary function is to vape, whereas the Duracell Optimum Batteries' primary function is to power devices.

Additionally, consumer bases do not overlap where one product's consumer base is narrower due to the product's somewhat specialized nature. *See, e.g.*, *Smith*, 988 F. Supp. at 841 (clothing products were not targeted to the same audience where one was for "men of all sizes" and the other was "geared only for big men"); *Guantanamera Cigars*, 2023 U.S. Dist. LEXIS 96562, at *8 (cigars were not targeted to the same audience where one was a high-end, premium cigar with a more knowledgeable consumer base and the other was a budget-conscious cigar with a wider consumer base). WAS Optimum Vaporizers are more specialized in nature, as they are age-restricted products used for the narrow purpose of vaping. In contrast, Duracell Optimum

27

Batteries can be used to power a variety of products, are not age-restricted, and cannot, on their own, be used to smoke any substance.

Accordingly, the seventh and eighth *Lapp* factors favor finding no likelihood of confusion.

### H.  The Parties' Products are Different Goods with Different Functions

The ninth *Lapp* factor requires courts to "examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship." *Id.* at 286.  "The test is whether the [products] are similar enough that a customer would assume they were offered by the same source." *Id.*  This is an "intensely factual" inquiry, and even where products "fall under the same general product category[,]" if the goods "operate in distinct niches[,]" courts find there is no likelihood of confusion.  *Id.* at 287-88.

Duracell argues that the Duracell Optimum Batteries serve a different purpose than WAS' Optimum Vaporizers: the former is "used to power common electronic devices such as TV remotes and children's[] toys" while the latter is used "to vaporize and inhale e-liquids, as an alternative to smoking cigarettes."  Mot. at 30-31.  Duracell also highlights that WAS Optimum Vaporizers contain their own internal battery and cannot be powered by Duracell Optimum Batteries.  *Id.* at 31.  WAS argues that even if the products serve different functions, the products' functions overlap because both products are technically batteries.  Opp'n at 15.  The Court agrees with Duracell.

WAS argues at length that the WAS Optimum Vaporizers are batteries because they fit technical definitions of a battery.[29]  *Id.* at 15-16.  But as Duracell notes, WAS cites no case where a product's technical definition factored into whether a consumer would believe the products are from the same source, especially like here, where most consumers are likely unaware of the technical definition of a battery.  *See* Reply at 7-8.  For a reverse confusion claim, courts look at the products' functions, not whether they "fall under the same general product category . . . ."  *Checkpoint*, 269 F.3d at 288.

Even assuming *arguendo* that WAS' Optimum Vaporizers are technically batteries, not all batteries can be used for vaping, like here.  *See* Reply at 7 ("[O]ne could not use . . . a Duracell battery to vape.").  Because the parties' products perform markedly different functions, a customer is unlikely to believe they come from the same source.  *See, e.g.*, *Harlem Wizards*, 952 F. Supp. at 1095 (show basketball is "markedly distinct from NBA competitive basketball"); *Taj Mahal Enters., Ltd. v. Trump*, 745 F. Supp. 240, 249 (D.N.J. 1990) (Indian cuisine restaurant distinct from a hotel/casino); *Sunenblick v. Harrell*, 895 F. Supp. 616, 629 (S.D.N.Y. 1995) (jazz records distinct from hip-hop records); *Checkpoint*, 269 F.3d at 288 (physical security and computer security served different branches of the corporate security industry).

Accordingly, the ninth *Lapp* factor favors finding no likelihood of confusion.

---

[29] These technical definitions are (1) for a battery, "one or more cells fitted with devices necessary for use, for example case, terminals, marking and protective devices"; and (2) for a primary battery, "one or more primary cells, including case, terminals and marking."  Opp'n at 15 (cleaned up).  WAS argues the WAS Optimum Vaporizers are batteries because they "comprise at least a casing, safety circuitry, and an internal cell."  *Id.* at 16.

## I.  Duracell Has No Plans to Expand Into the Vaping Market

For a reverse confusion claim, the tenth and final *Lapp* factor evaluates the likelihood that consumers would expect the defendant/junior user to expand into the plaintiff's/senior user's market.  *A&H Sportswear*, 237 F.3d at 234 (citing *Fisons*, 30 F.3d at 480).

Duracell argues there is no evidence it plans to enter the vaping business or that consumers would expect Duracell to do so.  Mot. at 33.  Duracell also highlights that "none of the major household battery manufacturers sell vaping devices."  *Id.*  WAS does not dispute there is no evidence that Duracell plans to enter the vaping business.  *See* Opp'n at 28.  However, WAS argues that consumers would expect Duracell to expand into the vaping business because Duracell batteries can be used to power a "wide reach of products[,]" including some vaping products.  *Id.*  Duracell responds that whether third-party vaping devices use AA/AAA batteries is irrelevant.  Reply at 11.  The Court agrees with Duracell.

WAS cites nothing to support that one product's use of another product creates a consumer expectation that the latter company will enter the business of the former.  Further, WAS' argument necessarily suggests that consumers would also expect Duracell to enter the remote-controlled toy, alarm clock, and flashlight business, among the litany of other products powered by AA/AAA batteries.  This would be absurd.  There is simply no evidence to support that Duracell plans to, or that consumers would expect Duracell to, enter the vaping business.  *See Harlem Wizards*, 952 F. Supp. at 1099 (no likelihood that show basketball would expand to purely competitive basketball when plaintiff offered no evidence in support).

Accordingly, the tenth and final *Lapp* factor favors finding no likelihood of confusion.  Because all *Lapp* factors favor finding no likelihood of confusion, the Court will dismiss WAS' reverse confusion claim (Count One).  Because WAS' remaining unfair competition claims are

contingent on the same allegations, the Court will also dismiss these claims (Counts Two and Three).  Thus, WAS' Third Amended Complaint will be dismissed.[30]

Further, because WAS' Third Amended Complaint will be dismissed, WAS' motion for summary judgment as to Duracell's affirmative defenses is moot.

## IV.   CONCLUSION

For the reasons stated above, the Court will **GRANT** Duracell's motion and **DISMISS** WAS' complaint **with prejudice**.  Consequently, the Court will **DENY** WAS' motion as **MOOT**.  An appropriate Order accompanies this Opinion.


Dated: March 27, 2024

_Evelyn Padin_
_____
Evelyn Padin, U.S.D.J.

---

[30] Additionally, to the extent that Duracell's Proposed Order, D.E. 200-2, requests dismissal of Duracell's counterclaims, D.E. 115, without prejudice, the Court will grant Duracell's request.